UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER VARGAS,

                              Plaintiff,

              -v-

THE ST. LUKE'S-ROOSEVELT
HOSPITAL CENTER *et al.*,

                              Defendants.

---

16-CV-5733 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Plaintiff Christopher Vargas brings this discrimination suit against his former employer,

St. Luke's-Roosevelt Hospital Center; its parent hospital system, Mount Sinai Health Systems,

Inc.; and his former supervisor, Ricardo Mendoza.   Vargas alleges discrimination in violation of

the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 ("ADA"); the New York State

Human Rights Law, N.Y. Exec. Law §§ 290–297 ("NYSHRL"); and the New York City Human

Rights Law, N.Y. City Admin. Code §§ 8-101-131 ("NYCHRL").   Vargas also brings claims of

retaliation in violation of the NYCHRL and Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e-5 ("Title VII").   Presently before the Court is Defendants' motion for summary

judgment.[1]   For the reasons that follow, Defendants' motion is granted with respect to Plaintiff's

---

[1]   *See* Motion for Summary Judgment, filed Jan. 25, 2018 (Dkt. No. 42) ("Not. Mot.");
Declaration of Rory J. McEvoy, filed Jan. 25, 2018 (Dkt. No. 43) ("McEvoy I Decl.");
Declaration of Ricardo Mendoza, filed Jan. 25, 2018 (Dkt. No. 44) ("Mendoza I Decl.");
Declaration of Joseph Davis, filed Jan. 25, 2018 (Dkt. No. 45) ("Davis Decl."); Defendants' Rule
56.1 Statement, filed Jan. 25, 2018 (Dkt. No. 46) ("Def. 56.1"); Memorandum of Law in Support
of Motion for Summary Judgment, filed Jan. 25, 2018 (Dkt. No. 47) ("Def. Mem."); Rule 56.1
Counter-Statement, filed April 13, 2018 (Dkt. No. 52) ("Pl. 56.1"); Memorandum of Law in
Opposition to Summary Judgment, filed April 18, 2018 (Dkt. No. 57) ("Pl. Mem."); Affirmation
of Melissa Mendoza, filed April 18, 2018 (Dkt. No. 61) ("Mendoza Aff."); Declaration of
Christopher Vargas, filed April 19, 2018 (Dkt. No. 62) ("Vargas Decl."); Declaration of Rory J.
McEvoy, filed May 2, 2018 (Dkt. No. 66) ("McEvoy II Decl."); Declaration of Ricardo

federal claims and the non-federal claims are dismissed without prejudice.

## I.      Background

The following facts are undisputed except where otherwise noted.[2]

### A.      Vargas's Employment at the Hospital

Plaintiff Christopher Vargas was hired as a part-time emergency medical technician ("EMT") at the St. Luke's-Roosevelt Hospital Center (the "Hospital") in June 2014.   (CV Tr. 7, 14).   Maximo Sierra — a paramedic at the hospital, who is also the ex-husband of Vargas's sister — provided Vargas's resume to the Hospital.   (MS Tr. 6, 15, 16).   Specifically, Sierra sent Vargas's resume to Ricardo Mendoza, who is the Emergency Medical Services ("EMS") operations manager at the hospital.   (RM Tr. 7).

After Vargas began working at the Hospital, it was discovered that he was not permitted to work in the New York City 911 system because he had previously been terminated from employment with the New York City Fire Department as a result of an off-duty arrest.   (CV Tr. 15, 17-18; RM Tr. 14.)   Mendoza informed Vargas that he could resign and reapply once he was

---

Mendoza, filed May 2, 2018 (Dkt. No. 67) ("Mendoza II Decl."); Defendants' Response to Plaintiff's Rule 56.1 Counter-Statement, filed May 2, 2018 (Dkt. No. 68) ("Def. 56.1 Response"); Reply Memorandum of Law Support of Motion for Summary Judgment, filed May 2, 2018 (Dkt. No. 69) ("Def. Reply").

[2]   Many of the relevant facts are derived from deposition transcripts and notarized witness statements.   *See* Deposition Transcript of Plaintiff Christopher Vargas, conducted on Aug. 16, 2017 (Dkt. No. 43-1) ("CV Tr."); Deposition Transcript of Salvatore LaVecchia, conducted on Sept. 21, 2017 (Dkt. No. 43-2) ("SL Tr."); Deposition Transcript of Ricardo Mendoza, conducted on Sept. 22, 2017 (Dkt. No. 43-3) ("RM Tr."); Deposition Transcript of Maximo Sierra, conducted on Sept. 22, 2017 (Dkt. No. 43-4) ("MS Tr."); Jimmy Henry Statement (Dkt. No. 43-5) ("JH Stat."); Barbara Karagiannis Statement (Dkt. No. 43-6) ("BK Stat."); Maximo Sierra Statement (Dkt. No. 43-7) ("MS Stat."); Lea Vazquez Statement (Dkt. No. 43-8) ("LV Stat.").

cleared to work in the New York City 911 system.   (RM Tr. 15.)   Vargas resigned.   (CV Tr.

17.)   After being cleared to work within the 911 system, Vargas reapplied, and was rehired, for a

part-time EMT position at the Hospital.   (CV Tr. 18–19.)   While employed, Vargas was a

member of the 1199 SEIU United Healthcare Workers East Union (the "Union").   (CV Tr. 35.)

As a part-time employee, Vargas was required to serve a four-month probationary period.   (CV

Tr. 35.)   However, Mendoza, his supervisor, mistakenly believed it was a three-month

probationary period.   (RM Tr. 17.)   This probationary period is intended to determine whether

the new employee should continue to work at the hospital.   (SL Tr. 17–18.)   Under the

collective bargaining agreement between the Union and the Hospital, employees can be

terminated during the probationary period without just cause.   (*See* Dkt. No. 43-9 ("Collective

Bargaining Agreement").)

　　　During the period of Vargas's employment, EMTs were required to sign a check-out list

verifying that all the items listed were on the ambulance.   (RM Tr. 23.)   On April 22, 2015,

Vargas received a warning from Mark Ayuyao, one of his supervisors, for failing to accurately

complete the check-out list.   (CV Tr. 39–40; *id.* Ex. 9.)   Four days later, on April 26, 2015,

Vargas received a second warning from Ayuyao for once again failing to accurately complete the

check-out list.   (CV Tr. 40; *id.* Ex. 10.)   While working as an EMT, Vargas worked with other

experienced EMTs.   (RM Tr. 33–34.)   Three of these EMTs were Jimmy Henry, Lea Vazquez,

and Barbara Karagiannis.   (RM Tr. 29–30, 40; *id.* Ex. 5.)   Each of those individuals complained

to Mendoza, the EMS Operations Manager, that Vargas was lazy, provided poor patient care, and

came to work without his equipment.   (RM Tr. 29–30, 40; *id.* Ex. 5.)   Statements made by these

EMTs about working with Vargas included "I felt like I was working alone" and "I felt like I had

to both drive the ambulance and provide patient care."   (LV Stat. ¶ 3; JH Stat. ¶ 4.)   On one

occasion, Vazquez went on a call with Vargas to respond to a patient with a femur fracture.

(LV Stat. ¶ 4.)   Once they located the patient, Vazquez returned to the ambulance to get a

stretcher and additional equipment.   When Vazquez returned to the patient, she saw Vargas

sitting on a stool and using his phone.   (*Id.*)   Vazquez and Vargas later went on a second call

together.   (*Id.* ¶ 6.)   Vazquez left the patient to return to the ambulance and get a stretcher.

(*Id.*)   Vargas also left the patient and came outside to tell Vazquez that the patient did not look

good.   (*Id.*)   Vazquez complained to Mendoza about both of these incidents.   (*Id.* ¶¶ 5,7.)[3]

Vargas also went on a call with EMT Barbara Karagiannis to respond to an elderly man

who was bleeding profusely from a lacerated hand.   (BK Stat. ¶¶ 4,6.)   Karagiannis drove the

ambulance and Vargas was in charge of patient care during transport.   (*Id.* ¶ 5.)   While en route

to the hospital, Vargas did not evaluate the patient.   (*Id.* ¶ 7.)[4]   When the ambulance arrived at

the hospital, Karagiannis found Vargas in the back of the ambulance in a chair, and the patient

was pale and covered in blood.   (BK Stat. ¶ 7.)   Karagiannis complained to Mendoza about this

incident.   (*Id.* ¶ 9.)   Vargas's co-workers also complained to Maximo Sierra about Vargas's job

performance, because they knew Sierra had a personal relationship with Vargas.   (MS Stat. ¶ 5;

MS Tr. 25.)   Vargas's co-workers told Sierra that Vargas ate in the back of the ambulance while

---

[3]   Vargas takes issue with the fact that Vazquez's account of these incidents was
recorded several years after they allegedly occurred, and notes that the incidents are not
mentioned in the Patient Care Summary for the call, but does not otherwise dispute the
statement.   *See* Pl. 56.1 ¶ 45.

[4]   Vargas states that he was not required to evaluate the patient in the ambulance, but
does not dispute that he did not evaluate the patient.   *See* Pl. 56.1 ¶ 49.

there were patients present, showed up to work without a uniform, removed his shoes in the ambulance, and came to work without the necessary equipment.   (MS Stat. ¶ 5.)[5]   Sierra relayed these complaints to Mendoza.   (*Id.* ¶ 7.)   Sierra also told Vargas about at least one complaint from a co-worker and instructed Vargas to "shape up."   (*Id.* ¶ 6; CV Tr. 51; MS Tr. 18, 25.)

### B.   Vargas's Responsibilities as an EMT

The job posting for the EMT position stated that it was an essential function of the position under the ADA that an employee be able to "lift and carry a patient and stretcher up and down several flights of stairs with small or no landings" and also to "lift stretcher[s], Incubators, and other equipment with patients aboard into the ambulance."   (Mendoza I Decl. ¶ 17; *id.* Ex. 3.)[6]   Vargas would not be able to perform the EMT job if he could not engage in physical

---

[5]   Vargas notes that Sierra's statement was taken almost two years after the event in question, and notes that Sierra did not witness any of the activity complained about firsthand, but does not otherwise dispute the statement.   Pl. 56.1 ¶ 55.

[6]   Vargas contends that the Court should not consider the Mendoza I and Mendoza II Declarations, asserting that "Defendants introduced new testimony to the record by attaching to their motion for summary judgment an affidavit of a witness stating that the decision to terminate Plaintiff was made before Plaintiff gave Defendants his request for a reasonable accommodation."   Pl. Mem. at 5.   However, to the extent that Mendoza's declarations include statements that were not otherwise made during discovery, or that may be inconsistent with other statements made during discovery, those statements either address issues not clearly explored during his deposition, or explicitly explain any discrepancy with deposition testimony. *See Thurston Foods, Inc. v. Wausau Bus. Ins. Co.*, No. 15-CV-14, 2017 WL 4765646, at *4 (D. Conn. Oct. 20, 2017) (considering declaration on summary judgment motion where "[i]n response to defendant's assertion of a sham affidavit, plaintiff submitted another affidavit by [individual], explaining the apparent contradictions."); *In re Fosamax Prod. Liab. Litig.*, 647 F. Supp. 2d 265, 281 (S.D.N.Y. 2009) ("The alleged contradictions concern areas that were not fully or clearly explored at [the witness's] initial deposition. The Court finds that there are no discrepancies that would justify excluding [witness's] declaration under the sham affidavit rule.").   Further, as discussed *infra*, Vargas stipulated to the fact that the decision to terminate his employment was made before Defendants were aware of his alleged disability.   *See* Pl. 56.1

activity because of the physical nature of many of the job tasks, including lifting patients on stretchers down flights of stairs.   (RM Tr. 36–37.)

      **C.**      **Vargas's Termination from the Hospital**

At some point during either the end of May or the first few days of June 2015, Mendoza made the decision that Vargas would not pass probation and would instead have his employment terminated because of his poor performance and co-worker complaints.   (RM Tr. 31–33.)

On June 3, 2015, Vargas had surgery to remove his appendix.   (CV Tr. 2.)   After the surgery, the doctor advised Vargas that he could return to "work" on June 10, 2015, but could not return to "full physical activity" until August 10, 2015.   (CV Tr. 52, *id.* Ex. 12.)

On June 5, 2015, Vargas came to the hospital and met with Mendoza.   (RM Tr. 27.) The parties offer different accounts of what transpired next.

According to Defendants, Mendoza informed Vargas that he was being terminated because of complaints from his co-workers.   (RM Tr. 27.)   After Vargas was informed that he was terminated, he asked Mendoza if there was anything that could be done about his termination.   (Mendoza I Decl. ¶ 2d; RM Tr. 33.)   Mendoza stated he would speak with Joseph Davis, who was the Administrative Director of EMS at the hospital.   (Davis Decl. ¶ 1.)   Vargas also told Mendoza about his surgery and showed him the doctor's note indicating that he could return to full physical activity by August 10, 2015.   (RM Tr. 27, Mendoza I Decl. ¶ 2a.)   The parties agree that Mendoza stated that Vargas "had no rights" at the June 5 meeting, but the parties dispute what Mendoza meant by this statement.   *See* CV Tr. 57; Pl. 56.1 ¶¶ 88–91.

¶ 59 (citing RM Tr. 31-33).

After speaking with Davis, Mendoza called Vargas on June 8, 2015, and reiterated that Vargas was being terminated because he failed probation.   (Mendoza I Decl. ¶ 6.)

According to Vargas, Mendoza did not say anything about co-worker complaints or otherwise indicate that Vargas was fired during the June 5 meeting.   (CR Tr. 56, 57.)   Vargas agrees with Defendants that he was informed on June 8, 2015, that he was terminated, but he alleges that this was the first time he was told about his termination.   (CV Tr. 57, 58.)

### D.   Douglas Monzon

Douglas Monzon was another EMT at the hospital who was supervised by Mendoza. (RM Tr. 39.)   In the middle of his probationary period in 2015, Monzon requested a leave of absence to recover from an appendectomy.   (RM Tr. 37–39; *id.* Ex. 4; Mendoza I Decl. ¶¶ 8, 11.)[7]   Monzon's leave request was approved.   (Mendoza I Decl. ¶ 8.)   No complaints were made against Monzon by his co-workers during his time at the hospital, and there were no plans to terminate him when he made his request for a leave of absence.   (*Id.* ¶ 7.)   Monzon returned to work when he was able to work without physical limitation.   (*Id.* ¶ 9.)

### E.   Procedural History

The complaint in this action was filed on July 19, 2016.   *See* Complaint (Dkt. No. 1). Following the close of discovery, Defendants filed this motion for summary judgment on January 25, 2018.   *See* Not. Mot.   The motion was fully briefed as of May 2, 2018.   *See* Def. Reply.   After the passing of Judge Batts, this case was reassigned to the undersigned on

---

[7]   In his 56.1 filing, Vargas disputes that Monzon requested a leave of absence by noting that Monzon also requested a transfer from the part-time EMT position to the full-time EMT position at the same time as his leave request.   However, Vargas does not articulate how such a request is inconsistent with a request for a leave of absence.   *See* Pl. 56.1 ¶ 93.

February 20, 2020.

## II.     Legal Standard

Granting summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *see also* Fed. R. Civ. P. 56(c)(4) (parties shall "set out facts that would be admissible in evidence.").

In determining whether a genuine dispute of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).   Once the moving party has shown that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (citation omitted) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).   In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," *Anderson*, 477 U.S. at 256, and "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions

that are conclusory," *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## III.    Discussion

Vargas asserts claims of disability discrimination, failure to accommodate, and retaliation under the ADA, Title VII, the NYSHRL, and the NYCHRL.[8]  The Court begins with the federal claims.

### A.    ADA Claims

Claims of discrimination under the ADA are analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998).  Under this framework, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 231 (2d Cir. 2015) (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).

> To establish a prima facie case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his

---

[8] Although Vargas initially asserted gender discrimination claims, he voluntarily dismissed those claims in January 2018.  (*See* Dkt. No. 41.)

> disability.   Similarly, to establish a prima facie case for failure to provide a
> reasonable accommodation, a plaintiff also must satisfy the first three factors, but
> for the fourth factor, he must show by a preponderance of the evidence that his
> employer refused to make a reasonable accommodation.   The ADA defines
> disability to include, among other things, a physical or mental impairment that
> substantially limits one or more major life activities.

*Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (internal footnotes, citations, and quotation marks omitted); *accord Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001). Critical to Vargas's ADA discrimination and failure-to-accommodate claims is the determination of whether the short-term effects of having an appendix removed are sufficient to establish a qualifying disability under the ADA.   The Court begins with that threshold question.

## 1. Whether Vargas was Disabled Under the ADA

The ADA prohibits discrimination "against a qualified individual on the basis of disability" in employment.   42 U.S.C. § 12112(a).   To establish a disability, a plaintiff must (1) "show that [he] suffers from a physical or mental impairment," (2) "identify the activity claimed to be impaired and establish that it constitutes a 'major life activity,'" and (3) "show that [his] impairment 'substantially limits' the major life activity previously identified."   *Weixel v. Bd. of Educ.*, 287 F.3d 138, 147 (2d Cir. 2002).

For claims, such as this one, that arise "after January 1, 2009, the ADA Amendment Act of 2008 ('ADAAA') governs the analysis."   *Green v. DGG Properties Co.*, No. 11-CV-1989, 2013 WL 395484, at *9 (D. Conn. Jan. 31, 2013).   The ADAAA commands that the definition of a "disability" be interpreted in "favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of [the] chapter."   42 U.S.C. § 12102(4)(A).   The term "disability" is defined as "(A) a physical or mental impairment that substantially limits one

or more major life activities of such individuals; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[9]   42 U.S.C. § 12102(1).   Major life activities include "caring for oneself, performing manual tasks . . . , walking, standing, lifting, bending, speaking, breathing . . . , and working," as well as "the operation of a major bodily function," including "neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Hutchinson v. Ecolab, Inc.*, No. 09-CV-1848, 2011 WL 4542957, at *8 (D. Conn. Sept. 28, 2011) (quoting 42 U.S.C. § 12102(2)(B)).

Even where temporary, "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting."   *Urena v. Swiss Post Sols., Inc.*, No. 16-CV-1998, 2016 WL 5173389, at *5 (S.D.N.Y. Sept. 21, 2016) (quoting 29 C.F.R. § 1630.2(j)(1)(ix)). "[H]owever '[t]he duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity.   Impairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe.'" *Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 211 (D. Conn. 2012).   The EEOC has promulgated administrative rules that guide the analysis of whether a temporary impairment is sufficiently severe to qualify as a disability under the ADA.   29 C.F.R. § 1630.2(j)(1)(ix) (app.).   Those regulations state that "if an individual has a back impairment that results in a 20-pound lifting restriction that lasts for several months, he is substantially limited in the major life activity of lifting, and therefore covered under the first prong of the definition of disability." *Id.* (internal citations and quotation marks omitted).   "While these regulations are not binding,

---

[9]   Vargas does not advance the theory here that he either had "a record of . . . an impairment" or was "regarded as having . . . an impairment."   42 U.S.C. § 12102(1).

they provide [courts] with guidance in interpreting the ADA." *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998).

Here, the parties agree that "[a]s a result of his appendicitis, [Vargas] was hospitalized for only one day, able to return to work after one week, and able to work at 'full physical activity' after two months." Pl. 56.1 ¶ 72 (citing CV Tr. 52; *id.* Ex. 12). Vargas's doctor further instructed him he could not engage in heavy lifting during the period in which he was to refrain from "full physical activity." Pl. 56.1 ¶ 86 (citing CV Tr. 105).[10] Such a short-term impairment, absent long-term impact, is insufficient to qualify as substantially limiting a major life activity, as required to qualify as a disability under the ADA. *See De La Rosa v. Potter*, 427 F. App'x 28, 29 (2d Cir. 2011) (internal citation omitted) ("A 'temporary impairment' lasting only a few months is, 'by itself, too short in duration . . . to be substantially limiting.'");[11] *Martinez v. N.Y. State Div. of Human Rights*, No. 13-CV-1252, 2015 WL 437399, at *7 (S.D.N.Y. Feb. 2, 2015) ("[A] worker with a short term impairment, like a broken wrist, is not disabled[,] consistent with the holdings of cases in this circuit both before and after the

---

[10]   Neither doctor's note contained in the record includes the "heavy lifting" limitation that Vargas references in his deposition testimony. (CV Tr. 107; *id.* Ex. 12, 13.) Rather, the notes broadly state that Vargas needed to be "excused" from "full physical activity." *Id.* Such vague short-term limitations, without further medical detail, do not support a finding of "substantial limitation in a major life activity," as required to qualify as disabled under the ADA. *See Emmons v. City Univ. of N. Y.*, 715 F. Supp. 2d 394, 409 (E.D.N.Y. 2010) (granting summary judgment on ADA claim where "plaintiff was injured in a car accident, was 'placed on an indefinite disability or sick leave by her physician,' and was cleared to return to work about two months later.").

[11]   Although *De La Rosa* involved a claim under the Rehabilitation Act, that statute "defines the term 'individual with a disability' by cross reference to the [ADA]" and thus *De La Rosa* and other Rehabilitation Act cases are instructive here. *Martinez*, 2015 WL 437399, at *5.

implementation of the ADAA[A].   Short-term injuries, without chronic or long-term impact, are

usually not considered substantially limiting impairments within the meaning of the ADA.");

*Dudley v. N.Y.C. Hous. Auth.*, No. 12-CV-2772, 2014 WL 5003799, at *34 (S.D.N.Y. Sept. 30,

2014) (granting summary judgment where plaintiff's disability "claims relate only to a temporary

injury while he was recovering after surgery for a torn meniscus"); *Nadel v. Shinseki*, 57 F. Supp.

3d 288, 296 (S.D.N.Y. 2014) (granting summary judgment where "[t]here [was] no dispute that

Plaintiff's knee injury was . . . temporary and lasted fourteen weeks"); *Palmieri v. City of

Hartford*, 947 F. Supp. 2d 187, 199 (D. Conn. 2013) (holding that plaintiff was not disabled

under the ADA where he "underwent surgery in August 2009, was terminated in October 2009,

and by March 2010 fully recovered from his back surgery and had no medically imposed work

restrictions"); *Verdi v. Potter*, No. 08-CV-2687, 2010 WL 502959, at *6 (E.D.N.Y. Feb. 9, 2010)

("Plaintiff's representation that he could have returned to work and could have performed his full

job duties precludes an inference that his impairment substantially limits a major life

activity. . . .   Plaintiff's impairment, which resulted in a period of just over two months disability

leave with no alleged residual, ongoing limitations thereafter, is not a disability within the

meaning of the . . . Act." (internal citations omitted)).

　　　Vargas directs the Court to *Summers v. Altarum Institute Corp.*, 740 F.3d 325 (4th Cir.

2014), in which the Fourth Circuit held that a plaintiff was disabled under the ADA after an

accident that "left him unable to walk for seven months."   *Id.* at 330.   Vargas's limitations do

not begin to approach the level of disability that was present in *Summers*.   As discussed above,

Vargas's doctor instructed him that was able to return to work within a week of his surgery and

capable of full physical activity after just two months.   Pl. 56.1 ¶ 72 (citing CV Tr. 52; *id.* Ex.

12).   Accordingly, this case is more analogous to other cases in the Second Circuit, cited above,

wherein summary judgment has been granted based on the short-term effects of a plaintiff's

impairment.   *See, e.g., De La Rosa*, 427 F. App'x at 29 ("Because [plaintiff] offers no evidence

that [his employer] believed his injury to be anything other than a temporary setback requiring

(at most) a short-term reduction in duties, no reasonable jury could conclude that [his employer]

perceived [plaintiff] as disabled within the meaning of the . . . Act."); *Martinez*, 2015 WL

437399, at *7 (plaintiff was not disabled under ADA and summary judgment was appropriate

where slip and fall incident prevented plaintiff from working for two months).

Because being disabled under the ADA is a requirement for each of Vargas's claims

under that act, summary judgment must be granted as to his ADA claims for failure to

accommodate and discrimination.

### 2.    Defendants' Knowledge of Vargas's Appendectomy

Summary judgment is also warranted on an independent ground: there is no genuine

dispute that the decision to terminate Vargas was made before his employer was aware of his

appendectomy.   The parties agree that Mendoza decided to terminate Vargas in late May or the

first few days of June due to his co-workers' complaints and his performance problems.   Pl. 56.1

¶ 59 (citing RM Tr. 27) ("At some point in late May or the first few of days of June 2015,

Mendoza decided that Vargas should not pass probation and that he should be terminated

because of the co-worker complaints and Vargas's poor performance.").   The parties also agree

that Defendants did not become aware of Vargas's appendectomy until June 5, 2015.   *Id.* ¶ 68

(citing RM Tr. 27; Mendoza I Decl. ¶ 2(a)).   Because the decision to terminate Vargas was

made before Defendants were aware of his appendectomy, the evidence fails to support a causal

relationship necessary to prevail on either a failure to accommodate or discrimination claim

under the ADA.[12]   *See Sista*, 445 F.3d at 169 (holding that a plaintiff alleging discrimination

under ADA must prove she "suffered adverse employment action because of h[er] disability.")

(quoting *Giordano*, 274 F.3d at 747); *Gronne v. Apple Bank For Sav.*, 1 F. App'x 64, 66 (2d Cir.

2001) ("To recover on an accommodation claim, a plaintiff must show that . . . the employer had

notice of her disability.").   Case law is clear that the time of the termination decision is the

relevant point at which to assess an employer's knowledge of an employee's alleged disability.

*See Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n.7 (2003) ("if [an employer] were truly

unaware that . . . a disability existed, it would be impossible for [an] [employment] decision to

have been based, even in part, on respondent's disability."); *Matya v. Dexter Corp.*, No. 97-CV-

763C, 2006 WL 931870, at *8 (W.D.N.Y. Apr. 11, 2006) ("Because the employer did not learn

of the diagnosis until after it decided to terminate the employee, the employee failed to establish

that he was discharged because of a disability.") (citing *Kolivas v. Credit Agricole*, 1996 WL

684167, at *4 (S.D.N.Y. November 26, 1996)), *aff'd*, 250 F. App'x 408 (2d Cir. 2007); *Woolley

v. Broadview Networks, Inc.*, No. 95-CV-5662, 2003 WL 554754, at *8 (S.D.N.Y. Feb. 26,

2003) ("no jury could conclude that [plaintiff's] termination was . . . because of his disability"

where individual who made decision to terminate plaintiff was unaware of disability at the time

---

[12]   In his deposition, Mendoza testified that he did not "make the decision to terminate [Vargas] on the spot [on June 5, 2015]," but rather that he had made the decision "[a] few days prior."   (RM Tr. 31); *see also* Mendoza I Decl. ¶ 3a "(Prior to June 3, 2015, the date of Mr. Vargas's appendectomy, I spoke with Mr. Davis regarding Mr. Vargas and whether he would pass probation. . . .   Mr. Davis and I decided that Mr. Vargas should not pass probation.").   Vargas has not put forth any evidence that conflicts with Defendants' evidence.

of the decision to terminate).[13]   Thus, the lack of evidence of a causal connection between

Vargas's alleged disability and his termination also mandates summary judgment on his ADA

claims.

Vargas takes issue with the fact that his termination review form indicates that his date of

termination was June 17, 2015, which is after defendants were aware of his appendectomy.

*See* Pl. Mem. at 17 (citing Plaintiff's Termination Review Form (Dkt. No. 61-16)).   Defendants

provide an explanation for this discrepancy, *see* Def. Reply at 9 n.10, but regardless, as discussed

above, Defendants' knowledge is measured at the time the termination decision is made — not

when the employee is informed of the termination.

Vargas also asserts that Defendants "discriminated based on his disability (appendicitis)

when Mendoza told him 'he had no rights' and 'it was not looking good for him.'"   Pl. Mem. at

4.   Vargas includes this allegation in his brief under the heading "Disability Direct

Discrimination."   Presumably, Vargas is making the argument that Mendoza's "no rights"

comment is the type of direct evidence that constitutes a "smoking gun" and permits a

discrimination plaintiff to "prevail without proving all the elements of a prima facie case."

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002); *see also Manon v. 878 Educ., LLC*,

---

[13]   Vargas's brief states that "only at a later step in the disability discrimination analysis — after the threshold question of disability — does the court look at what the employer knew in order to determine whether the adverse employment action was caused by the plaintiff's disability."   Pl. Mem. at 13-14.   This is incorrect.   Vargas appears to conflate the elements of a *prima facie* discrimination claim with the burden shifting *McDonnell Douglas* framework. Indeed, the very case that Vargas cites for his erroneous proposition makes clear that a *prima facie* case of discrimination requires that a plaintiff allege an "adverse employment action *because of* his disability."   *McMillan v. City of New York.*, 711 F.3d 120, 125 (2d Cir. 2013) (emphasis added).

16

2015 WL 997725, at *3 (S.D.N.Y. Mar. 4, 2015) ("The Second Circuit has noted that 'direct evidence' would roughly equate to a 'smoking gun' indicating that a plaintiff's firing was discriminatory.") (citing *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1239 (2d Cir. 1995)).

The parties dispute whether Mendoza's "no rights" comment was referring to his own belief that Vargas had no rights with regard to his alleged disability, Pl. Mem. at 4, or rather to Vargas's ability to be terminated without cause during his probationary period under the union's collective bargaining agreement, Def. Mem. at 17–18. Viewed in context, it is clear that Mendoza's comments are not direct evidence of discrimination. *See de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 23 (2d Cir. 1996) (given "context of a justified concern over language skills," employer's "comment that [plaintiff's] problems were 'cultural' and [employer's] comment that he and his new Hispanic supervisor 'will understand each other better'" were not direct evidence of discrimination). Further, though Mendoza filed a sworn declaration indicating what he meant when he said "no rights," *see* Mendoza I Decl. ¶ 2(c), Vargas failed to offer testimony or other evidence that would support his competing interpretation of the "no rights" comment. Indeed, in his deposition testimony, Vargas indicated that he thought Mendoza was referring to the fact that Vargas was "a brand new employee" and therefore had "no rights with the company." (CV Tr. 57.) This statement reinforces Mendoza's position that the "no rights" comment referred to the fact that Vargas could be terminated without cause during his probationary period. Thus, there is no evidence in the record from which a reasonable jury could find Mendoza's comment to be the type of "smoking gun" that constitutes direct evidence of disability discrimination.

Vargas also argues that the Court should not consider the Declaration of Joseph Davis in its analysis because Davis "was never mentioned prior to the close of discovery." Pl. 56.1 ¶ 60; *see also* Davis Decl.   As Defendants point out, however, Davis was mentioned prior to the end of discovery.   (*See* RM Tr. 11–12, 33.)   Moreover, the factual statement in the Davis Declaration that is most damning to Vargas's claims — that the decision to terminate Vargas was made prior to Defendants' becoming aware of Vargas's appendectomy — is a fact established elsewhere in the record.   (*See* RM Tr. 31–33.)   Indeed, Vargas effectively stipulated to it. *See* Pl. 56.1 ¶ 59.

Because Vargas's failure to accommodate claim fails on both of the above grounds, the Court need not and does not reach the parties' arguments regarding whether physical activity is an essential function of being employed as an EMT, such that no reasonable accommodation was available.   *See* Def. Mem. 12-16; Pl. Mem. at 16-18; Def. Reply at 5–6.

Buttressing the Court's conclusion is the undisputed evidence that Defendants granted the short-term accommodation of Douglas Monzon, another EMT who worked at the Hospital and underwent an appendectomy.   *See Peters v. Mount Sinai Hosp.*, No. 08-CV-7250, 2010 WL 1372686, at *13 (S.D.N.Y. Mar. 30, 2010) ("Courts often grant summary judgment in favor of an employer when the employer demonstrates that it has treated similarly situated employees in a non-discriminatory manner.").   And contrary to Vargas's assertion, Pl. Mem. at 4, the fact that the Hospital provided Monzon with an accommodation does not mean that the recovery period after an appendectomy is necessarily a disability under the ADA, or that light-duty work was a reasonable accommodation available to Vargas.   *See Garvey v. Sullivan*, 773 F. App'x 634, 637 (2d Cir. 2019) ("[P]rior assignment of temporary light-duty work to other disabled employees

does not constitute an admission that such light-duty work is a reasonable accommodation under the ADA.").

Finally, even assuming Vargas had stated a *prima facie* discrimination claim under the ADA, that claim fails on the additional and independent ground that Defendants have offered evidence of a legitimate nondiscriminatory reason for Vargas's termination, which Vargas has failed to genuinely dispute as pretextual.   The Court turns to that issue in the next section.

### 3.        Legitimate Nondiscriminatory Reason for Termination

"Even if the plaintiff succeeds in presenting a prima facie case, the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action. . . . Upon the defendant's articulation of such a non-discriminatory reason for the employment action, . . . the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination."   *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal citations omitted).

Here, Defendants have articulated a nondiscriminatory reason for Vargas's termination: his co-workers' complaints about his performance.   *See* Def. Mem. at 19–22; Def. Reply at 7–9. This articulated reason is supported by substantial evidence in the record — evidence that is not subject to genuine dispute.   *See, e.g.*, RM Tr. 29–30, 40; *id.* Ex. 5 (testimony regarding complaints of Vargas's co-workers about his performance and sworn statements by those co-workers detailing their complaints); CV Tr. 39–40; *id.* Ex. 9 (first warning given to Vargas for failing to accurately complete ambulance check-out form); CV Tr. 40; *id.* Ex. 10 (second warning given to Vargas for failing to accurately complete ambulance check-out form).

Vargas takes issue with the admissibility of statements made by his co-workers regarding

their complaints about his performance.   *See* Pl. Mem. at 5 ("Defendants' statements from

Plaintiff's coworkers will more than likely not be admissible as they are not based on personal

knowledge and were written two years after they were allegedly said to Mendoza.").   First, the

statements from Vargas's co-workers are clearly based on personal knowledge.   *See, e.g.*, JH

Stat. ¶ 4 ("When I worked with Mr. Vargas, I felt like I had to both drive the ambulance and

provide patient care.").   Second, if Vargas wishes to suggest that his former co-workers' sworn

statements were inaccurate because those co-workers were unable to remember what occurred

two years ago, he could have deposed those co-workers to establish any inaccuracy.   *See Ying*

*Jing Gan v. City of N. Y.*, 996 F.2d 522, 532 (2d Cir. 1993) ("If facts essential to support

opposition to the summary judgment motion are not available, the nonmoving party may seek a

continuance under Rule 56(f) to permit affidavits to be obtained or discovery to be had, but may

not rely simply on conclusory statements or on contentions that the affidavits supporting the

motion are not credible."); *Maturine v. Am. Int'l Grp., Inc.*, 2006 WL 2347806, at *4 (S.D.N.Y.

Aug. 14, 2006) ("[A] party who both fails to use the time available [to conduct discovery] and

takes no steps to seek more time until after a summary judgment motion has been filed need not

be allowed more time for discovery absent a strong showing of need.   Such a showing cannot be

satisfied by simply claiming that the declaration submitted in support of the summary judgment

is not credible.") (internal citation and quotation marks omitted).

Vargas also asserts that his co-workers' statements are "fabricated and/or falsified" but

provides no justification for this assertion.   *See* Pl. Mem. at 5.   Specifically, Vargas cites two

email threads related to Vargas's termination in support of the proposition that his co-workers'

complaints were fabricated.   (*See* Dkt. No. 61-23 (Bates D000139-D00142); Dkt. No. 61-24

20

(Bates D00145-D00150).)   However, Vargas's brief does not attempt to explain the rationale by which these documents support the conclusion that the complaints of Vargas's co-workers were fabricated, and the Court's review of the cited email threads indicates that no such rationale exists.

Vargas also purports to dispute the accuracy of the account of his co-worker Linda Vazquez regarding one incident showing Vargas's poor work performance.   *See* Pl. 56.1 ¶¶ 40, 41, 45 (citing LV Stat. ¶ 4).   But the evidentiary support that Vargas provides (Dkt. No. 61-21 (Prehospital Care Report Summary on April 28, 2015)) does not contradict Defendants' account of the incident.   Specifically, the care report does not contradict the assertion that Vargas was sitting on his phone rather than taking the patient's blood pressure.   (LV Stat. ¶ 4.)

### 4. Evidence of Pretext

Having established that Defendants have undisputedly articulated a legitimate, nondiscriminatory reason for Vargas's termination, the Court turns to pretext.   As noted above, "[u]pon the defendant's articulation of such a non-discriminatory reason for the employment action, . . . the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination."   *Weinstock*, 224 F.3d at 42 (internal citations omitted).

Vargas's argument that Defendants' articulated reason for termination was pretextual is difficult to decipher.   *See* Pl. Mem. at 20–22.   Vargas first reminds the Court that the evidence must be construed in his favor on a summary judgment motion.   *Id.* at 21.   He points out that his allegations of disability discrimination have remained constant throughout this litigation.   *Id.* He asserts that Defendants "should have kept a record of poor performance" and have

21

"contradicted their testimony," but he does not articulate a basis for those accusations.   *Id.*   And finally, he conclusorily states that "Defendants['] proffered reasons for [their] conduct taken against Plaintiff is [sic] clearly false and mere pretext, and at the very least genuine issues of material fact exist, making summary judgment improper."   *Id.* at 22.   Elsewhere in his brief, Vargas asserts that the complaints of his co-workers were "fabricated," but, as discussed above, he does not provide any evidence to support that assertion.   *Id.* at 5, 18.

Vargas has submitted no evidence — much less sufficient evidence to give rise to a genuine dispute — that Defendants' nondiscriminatory reason for termination was pretextual. This provides a third reason that summary judgment is warranted as to the ADA discrimination claim.   *See Fall v. N.Y. State United Teachers*, 289 F. App'x 419, 421 (2d Cir. 2008) ("Mere speculation is insufficient; a plaintiff must offer specific, admissible evidence of pretext.").   The lack of evidence of pretext is especially significant in a case like this one — where the employer's legitimate nondiscriminatory reason is clearly established and well documented. The Court concludes that no reasonable jury could find on this record that Defendants discriminated against Vargas under the ADA.

### B.    Title VII Retaliation Claim

Vargas also claims retaliation under Title VII.[14]   To make out a *prima facie* case of retaliation under Title VII, "a plaintiff must present evidence that shows (1) participation in a protected activity; (2) that [her employer] knew of the protected activity; (3) an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action."   *Littlejohn v. City of N.Y.*, 795 F.3d 297, 315–16 (2d Cir. 2015)

---

[14]  Vargas has not asserted a retaliation claim under the ADA.

(internal quotation marks omitted) (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

Generally, this last element may be shown either "(1) indirectly, by showing that the protected

activity was followed closely by discriminatory treatment, or through other circumstantial

evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2)

directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."

*Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *accord Littlejohn*, 795 F.3d at

319.

   Here, Vargas's retaliation claim fails because he has not offered evidence that he was

engaged in a protected activity, which is a required element of a *prima facie* retaliation claim.

Though Vargas's brief in opposition to summary judgment does not bother to identify the

protected activity he purports to have been engaged in, *see* Def. Mem. at 19–20, Vargas stated in

his deposition that he was retaliated against by Mendoza (1) because Vargas requested time off

(CV Tr. 76); (2) because of bad blood between Sierra and Vargas's sister (*id.* at 69); and (3)

because of Vargas's request for light duty following his appendectomy (*id.* at 82).   None of

these activities is protected under Title VII.   *See Laface v. E. Suffolk Boces*, 349 F. Supp. 3d

126, 152 (E.D.N.Y. 2018) ("Plaintiff's Title VII retaliation claim on the basis of a disability is

precluded by the statute.   Title VII does not prohibit discrimination or retaliation on the basis of

a disability."); *Venezia v. Luxoticca Retail N. Am. Inc.*, No. 13-CV-4467, 2015 WL 5692146, at

*12 (S.D.N.Y. Sept. 28, 2015) (holding that a "request to take paid time off" does "not rise to the

level of protected activity"), *aff'd*, 699 F. App'x 53 (2d Cir. 2017); *Risco v. McHugh*, 868 F.

Supp. 2d 75, 111 (S.D.N.Y. 2012) ("[A] complaint about disability-related discrimination cannot

form the basis of a retaliation claim under Title VII."); *Martinez v. N.Y.C. Dep't of Educ.*, No.

04-CV-2728, 2008 WL 2220638, at *11 (S.D.N.Y. May 27, 2008) (complaining of "allegedly unfair treatment from [an employer] on the basis of personal animosity" is not a protected activity); *Satterfield v. United Parcel Serv., Inc.*, No. 00-CV-7190, 2003 WL 22251314, at *12 (S.D.N.Y. Sept. 30, 2003) ("[P]ersonality conflicts are beyond the purview of Title VII."). Accordingly, Vargas's Title VII retaliation claim fails as a matter of law.

### C.    Remaining Non-Federal Claims

Vargas's state- and city-law claims are based on the Court's exercise of supplemental jurisdiction.   *See* Complaint ¶ 2.   After dismissal of Vargas's Title VII and ADA claims, no federal claims remain.   Under 28 U.S.C.A. § 1367(c)(3), this Court may decline to exercise supplemental jurisdiction over non-federal claims once the Court has "dismissed all claims over which it has original jurisdiction."   To determine whether to exercise supplemental jurisdiction over the remaining non-federal claims, courts are to consider the "familiar factors of judicial economy, convenience, fairness, and comity."   *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 81 (2d Cir. 2018) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Where, as is the case here, "all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."   *Cohill*, 484 U.S. at 350.   This is the especially the case where the remaining non-federal claims are analyzed under different legal frameworks and standards than the dismissed federal claims.   *See Giordano*, 274 F.3d at 754 ("[T]he appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York state and municipal law is a question best left to the courts of the State of New York."); *Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 428 (S.D.N.Y. 2018) (declining to exercise

supplemental jurisdiction over non-federal claims after granting summary judgment on all federal claims because "[c]ourts in this District routinely decline to exercise supplemental jurisdiction over a plaintiff's NYCHRL claims after dismissing all federal claims."); *Karmel v. Liz Claiborne, Inc.*, No. 99-CV-3608, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, the Court declines to exercise supplemental jurisdiction over Vargas's non-federal claims and dismisses those claims without prejudice.   *See Cohill*, 484 U.S. at 350.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED with respect to Vargas's ADA and Title VII claims, and those claims are hereby dismissed with prejudice.   The remaining claims under the NYSHRL and NYCHRL are dismissed without prejudice.

The Clerk of Court is directed to terminate the motion at Docket Number 42 and to close this case.

Dated: June 1, 2020
   New York, New York

_____
   J. PAUL OETKEN
   United States District Judge